In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3121

RORIC GIBBS,

*Plaintiff-Appellee,*

*v.*

BROOKE LOMAS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:12-cv-00789-slc — **Stephen L. Crocker**, *Magistrate Judge.*

ARGUED JANUARY 23, 2014 — DECIDED JUNE 17, 2014

Before POSNER and RIPPLE, *Circuit Judges*, and GILBERT, *District Judge.*[*]

RIPPLE, *Circuit Judge.* Officer Brooke Lomas, a police officer in Madison, Wisconsin, responded to a complaint that a man was driving through downtown Madison while holding an unholstered gun in the view of other drivers. After locating the

[*] The Honorable J. Phil Gilbert, of the United States District Court for the Southern District of Illinois, sitting by designation.

individual, Roric Gibbs, she issued a misdemeanor citation for disorderly conduct and searched his car. The citation was later dismissed, and Mr. Gibbs then brought this action under 42 U.S.C. § 1983 against Officer Lomas. Mr. Gibbs alleged that the arrest and search had violated his Fourth Amendment right to be free from unreasonable searches and seizures. Officer Lomas moved for summary judgment on the basis of qualified immunity. The district court denied her motion. We now reverse that determination. Even if Mr. Gibbs had a constitutional right to be free from this arrest and search, that right was not clearly established at the time of Officer Lomas's actions. The district court should have granted her motion.

# I

# BACKGROUND

## A.

Because this is an interlocutory appeal from a denial of summary judgment based on qualified immunity, we recount the facts as "asserted by the plaintiff" or as "assumed by the district court." *Jewett v. Anders*, 521 F.3d 818, 819 (7th Cir. 2008).

On July 15, 2012, Travis and Katherine Gruchow were driving through Madison, Wisconsin. The Gruchows saw a young man in a red Jeep Cherokee; he was holding near his head what appeared to be a handgun. The barrel was pointed at the ceiling of the Jeep. Mrs. Gruchow called the nonemergency number for the Madison Police Department. She told dispatch that she and her husband "saw [a] man driving with a handgun in his car, so we just thought we

should report it."[1] The dispatch officer asked whether the driver was threatening anyone. Mrs. Gruchow replied, "[N]o, he was driving—we couldn't tell if it [*the gun*] was real or not."[2] She said that the driver had the gun "up in the air when he was driving, kind of at his side."[3] Mrs. Gruchow told dispatch that the man had parked at Dexter's Pub, and she provided a description of the driver and the vehicle, including the vehicle's license plate number. She said that the driver went into the bar, which she thought "seem[ed] a little off."[4] Dispatch asked again if the driver was threatening someone or pointing the gun. Mrs. Gruchow said no, but that he had been "speeding really fast."[5]

Dexter's Pub is located on Officer Lomas's beat. Dispatch therefore advised her of the report, giving her a description of the individual and of the Jeep and telling her that the individual "had a gun on him" but that "nothing was threatened with

---

[1] R.23 (District Ct. Op.) at 3 (internal quotation marks omitted).

[2] *Id.* (second alteration in original) (internal quotation marks omitted).

[3] *Id.* (internal quotation marks omitted).

[4] *Id.* (internal quotation marks omitted).

[5] *Id.* (internal quotation marks omitted).

the weapon."[6] Dispatch also stated that the man might be "armed in the bar."[7] Officer Lomas drove to Dexter's Pub and, while en route, called the Gruchows. Mrs. Gruchow told Officer Lomas that while she and her husband were stopped at a red light, she had seen the driver of the vehicle in the next lane holding a black handgun near his head, pointed at the ceiling. She and her husband had followed the Jeep to Dexter's and, during the course of that drive, saw the driver hold the gun up and point it at the ceiling a second time. Mrs. Gruchow told Officer Lomas that the suspect was driving "badly," specifically that he had accelerated quickly from a red light.[8] Mrs. Gruchow stated that it did not appear as though the driver was going to harm himself. At her deposition, Officer Lomas recalled that, at the time she spoke with the Gruchows, she thought it was "very unusual" for someone to drive with a gun in his hand instead of having it "holstered or in the trunk or back seat."[9]

When Officer Lomas arrived at Dexter's, her superior, Sergeant Brian Chaney, already was there. Other officers also arrived on the scene. The officers decided to look at the Jeep,

---

[6] *Id.* (internal quotation marks omitted).

[7] Audio recording: Dispatch calls (July 15, 2012) (on file with court).

[8] R.12 (Lomas Dep.) at 3.

[9] *Id.*

which was parked and unoccupied, to see if a weapon was visible. However, before they did so, Mr. Gibbs walked out of the bar. Mr. Gibbs matched the physical description that the Gruchows had provided to Officer Lomas. Sergeant Chaney instructed Mr. Gibbs to show his hands, turn around and put his hands on the building wall. Mr. Gibbs complied with these orders. Officer Lomas then handcuffed Mr. Gibbs, and Sergeant Chaney frisked him for weapons. During this interaction, Mr. Gibbs told the officers that he was the driver of the Jeep. Officer Lomas then placed Mr. Gibbs in the back of a squad car.

While Mr. Gibbs was in the squad car, Officer Lomas called the Gruchows a second time. According to Officer Lomas, Mrs. Gruchow added to her earlier statement that "she was disturbed by the behavior."[10] Officer Lomas recalled that Mrs. Gruchow stated that

> initially she was reluctant to call police because she knew that the state had just passed new concealed carry laws, but that based on the driving behavior and the holding the gun visibly in the vehicle, they [the Gruchows] thought it was enough to warrant a call to police to have it checked out.[11]

After this conversation, Officer Lomas explained to Mr. Gibbs that he was being detained because someone had seen him driving his vehicle and pointing a gun at the ceiling

---

[10]  *Id.* at 5.

[11]  *Id.*

of the car. She also informed him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). After hearing his rights, Mr. Gibbs told Officer Lomas that he had airsoft guns in his car. Airsoft guns are replicas of firearms; they usually have the same color, dimensions, weight and markings as real firearms. Mr. Gibbs explained that he was on his way home from an airsoft event, where he had been a referee, when a friend called and suggested that they meet at Dexter's for a drink.

The parties disagree as to whether, during the course of this conversation, Mr. Gibbs consented to Officer Lomas's search of the Jeep. Officer Lomas stated that during her discussion with Mr. Gibbs, he had consented to her looking in the Jeep for the airsoft weapons.[12] By contrast, Mr. Gibbs testified that Officer Lomas had asked for permission to search his Jeep, but he had denied it.[13] He said that he had offered to get the items for her but that he had refused her request to search the vehicle.[14] In any event, Officer Lomas searched the Jeep and found an airsoft shotgun, an airsoft handgun and a plastic knife. She stated that the handgun was visible just by looking in the window of the Jeep. She took the airsoft handgun and placed it in her squad car because she believed that it was evidence of a disorderly conduct violation.

---

[12]  *Id.* at 6.

[13]  R.15 (Gibbs Dep.) at 16.

[14]  At the summary judgment stage, we take Mr. Gibbs's version of events as true and assume that there was no consent.

After the search, Officer Lomas discussed the situation with Sergeant Chaney, and they decided to issue Mr. Gibbs a misdemeanor citation for disorderly conduct. Mr. Gibbs signed the citation to acknowledge that he had received it and that it was explained to him. He then was released. According to the law enforcement report, the entire interaction lasted approximately thirty minutes; Mr. Gibbs says it took about an hour. The citation was later dismissed pursuant to an agreement made by Mr. Gibbs's lawyer and the assistant district attorney and approved by a state judge.

### B.

On October 31, 2012, Mr. Gibbs brought this action against Officer Lomas under 42 U.S.C. § 1983. He did not name as defendants any of the other officers who had been present in the parking lot at Dexter's Pub. He sought damages and declaratory relief, alleging that he had been arrested without probable cause and that his car had been searched without a warrant, in violation of his rights under the Fourth Amendment as made applicable to the states through the Fourteenth Amendment. The Gruchows, Officer Lomas and Mr. Gibbs gave depositions. Officer Lomas then moved for summary judgment.

In support of her motion, Officer Lomas argued to the district court that her actions conformed to the Constitution because she had probable cause to arrest Mr. Gibbs for disorderly conduct under Wisconsin state law. She took the view that, despite a recent statutory amendment that exempts (in the absence of "other facts and circumstances that indicate a

criminal or malicious intent") "loading, carrying, or going armed with a firearm" from the category of citable disorderly conduct, *see* Wis. Stat. § 947.01(2), the totality of the circumstances here—that Mr. Gibbs was driving fast on city streets while pointing an unholstered gun at the ceiling of his car—gave her probable cause to arrest and cite Mr. Gibbs. Consequently, she maintained, the search of the car was constitutionally permissible as a search incident to arrest. Alternatively, Officer Lomas submitted that she was entitled to qualified immunity because, at the time she acted, any constitutional right that had been violated was not clearly established.

The district court denied Officer Lomas's motion. In its view, "the facts known to Lomas at the time were not sufficient to warrant a belief that Gibbs had committed disorderly conduct," and, therefore, Officer Lomas did not have probable cause to arrest Mr. Gibbs.[15] In arriving at its decision, the district court focused on the recent amendment to Wisconsin's disorderly conduct statute: "Although seeing a person hold a gun in a car likely would alarm many people, and may well have been a rare sight before the passage of the [statute], the State of Wisconsin has specifically implemented a right to carry firearms openly and has explicitly exempted such behavior from prosecution."[16] The district court concluded that the issuance of the citation constituted the violation of a clearly

---

[15]   R.23 at 1.

[16]   *Id.* at 10.

established constitutional right because a reasonable police officer in the same circumstances as Officer Lomas would not believe that she had probable cause to arrest Mr. Gibbs. Therefore, the district court held that Officer Lomas was not entitled to qualified immunity. Officer Lomas timely appealed.

## II

## DISCUSSION

### A.

On appeal, Officer Lomas contends, as she did in the district court, that she did not violate Mr. Gibbs's constitutional rights and, even if she did, those rights were not clearly established when she acted. Accordingly, she urges, she is entitled to qualified immunity. For the reasons set forth in this opinion, we believe that there is merit in Officer Lomas's submission. We first address several threshold matters.

### 1.

Our appellate jurisdiction is secure. "[A] district court's denial of summary judgment usually is an unappealable interlocutory order … ." *Jewett v. Anders*, 521 F.3d 818, 821–22 (7th Cir. 2008). However, there is a well-established exception to this general rule under the collateral order doctrine where a party challenges a district court's determination that a government official is not entitled to qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985). Of course, when we exercise this jurisdiction, we have authority only over

appeals involving "abstract issues of law," *Johnson v. Jones*, 515 U.S. 304, 317 (1995), i.e., those in which a district court has decided, as a matter of law, whether a given set of facts demonstrates that a violation of a clearly established constitutional right has occurred, *see Mitchell*, 472 U.S. at 527–30. *See also Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005). We do not have, by contrast, jurisdiction over appeals from district court orders regarding "'evidence sufficiency,'" i.e., those in which a district court has assessed whether a party has produced sufficient evidence to create a genuine issue of triable fact warranting trial on the merits. *See Johnson*, 515 U.S. at 313–18.

Here, Officer Lomas's appeal clearly falls within the first category: She submits that, even considering the facts in the light most favorable to Mr. Gibbs, those facts do not amount to a clearly established constitutional violation. Therefore, mindful of the limits of our jurisdiction, we must construe all facts and inferences in favor of Mr. Gibbs and examine only the "purely legal question" of whether those facts "make out a violation of clearly established law." *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014) (internal quotation marks omitted).

**2.**

The standard of review is also well established. We review de novo the denial of a motion for summary judgment on qualified immunity grounds. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013).

> In conducting our review, we do not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter; rather, we determine whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Jewett*, 521 F.3d at 821 (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

**B.**

Having completed our examination of the pertinent threshold issues, we now come to the merits of Officer Lomas's qualified immunity defense.

**1.**

We first examine the requirements of the qualified immunity doctrine that Officer Lomas maintains protects her from exposure to trial and liability from damages.

"Section 1983 allows citizens whose constitutional rights have been violated by public officials to sue those officials in

their individual capacities." *Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 878 (7th Cir. 2012). In responding to such an action, a public official may raise the affirmative defense of qualified immunity. *Jewett*, 521 F.3d at 823. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). This doctrine balances competing concerns: On one hand, it protects a government official's ability to function without the threat of distraction and liability, *see Richardson v. McKnight*, 521 U.S. 399, 407–08 (1997); and, on the other, it affords members of the public the ability to "vindicate constitutional violations by government officials who abuse their offices," *Jewett*, 521 F.3d at 822 (internal quotation marks omitted).

Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013). If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment. We are permitted to address the two prongs of qualified immunity in either order. *Pearson*, 555 U.S. at 236. With this background, we now turn to the facts presented by the record.

**2.**

Mr. Gibbs claims that, by arresting him for disorderly conduct, Officer Lomas violated his Fourth Amendment right to be free from unreasonable seizures. "'False arrest' is short-hand for an unreasonable seizure prohibited by the Fourth Amendment." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012). Because the presence of probable cause makes a warrantless arrest reasonable under the Fourth Amendment, "the existence of probable cause is an absolute defense to a § 1983 claim for false arrest." *Gutierrez v. Kermon*, 722 F.3d 1003, 1007 (7th Cir. 2013). Accordingly, Officer Lomas submits that the record establishes that she had probable cause to arrest Mr. Gibbs for disorderly conduct. We must evaluate that submission.

"An officer has probable cause to make an arrest only when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense." *Reher v. Vivo*, 656 F.3d 772, 776 (7th Cir. 2011). In making this assessment, we ask whether, given the "totality of the circumstances," a reasonable officer would believe that the suspect had committed a crime. *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013) (internal quotation marks omitted). "We do not consider the subjective motivations of the officer." *Id.* Where, as here, part of the officer's probable cause analysis is based on an informant's tip, we have stated that "as long as a reasonably credible witness or victim informs the police that someone has committed a crime, or is committing[] a crime, the officers have probable

cause." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 706–07 (7th Cir. 2012) (internal quotation marks omitted).

Our present task, therefore, is to determine whether the totality of the circumstances, as known to Officer Lomas at the time she arrested Mr. Gibbs, gave her probable cause to believe that Mr. Gibbs had committed the crime of disorderly conduct. At the time that Mr. Gibbs was handcuffed and placed in the back of the police vehicle,[17] Officer Lomas knew the following, based on the call from dispatch and her personal phone conversation with Mrs. Gruchow: (1) Mrs. Gruchow had called dispatch to report a man driving through Madison with what looked like a black handgun; (2) Mrs. Gruchow saw the man holding the gun near his head, pointed at the roof of his car, while stopped at a red light; (3) the man was driving "badly" and had accelerated quickly from the red light; (4) while driving, the man raised the gun and pointed it at the roof of his car a second time; (5) the man had not threatened anyone or anything with the gun; (6) the man parked at Dexter's Pub and may have entered the bar armed; (7) the Gruchows had

---

[17] As a preliminary matter, we note that both parties assume that there was an arrest as opposed to an investigatory detention. The district court proceeded on the same basis. Although neither the parties nor the district court identified, with any specificity, the point at which an arrest took place, the parties appear to assume that the arrest occurred when Mr. Gibbs was handcuffed and placed in the back of a police vehicle. *See* Appellee's Br. 7–8 (explaining what Officer Lomas knew at that point in time); Reply Br. 3–8 (same); *cf. Monroe v. Davis*, 712 F.3d 1106, 1115 (7th Cir. 2013) (noting that placing an individual in handcuffs might indicate that a custodial arrest has occurred). We shall pretermit an extensive discussion of this point because, in our view, the matter is not outcome determinative in this case.

provided a detailed description of the man and his vehicle;
(8) a vehicle matching the description was parked at Dexter's
Pub; (9) a man matching the description exited Dexter's Pub;
and (10) when confronted by the police officers, the man said
that he owned the relevant vehicle. Mr. Gibbs does not argue
that the Gruchows were unreliable or that they were not
reasonably credible witnesses, nor does he challenge that
Officer Lomas knew the foregoing information at the time of
his arrest. He only challenges the legal significance of the facts
recounted.

Whether these facts gave Officer Lomas probable cause to
arrest Mr. Gibbs depends on the elements of the crime of
disorderly conduct. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d
706, 715 (7th Cir. 2013) ("The existence of probable cause or
arguable probable cause depends, in the first instance, on the
elements of the predicate criminal offense(s) as defined by state
law."). Wisconsin's disorderly conduct statute provides:

> (1) Whoever, in a public or private place, engages in
> violent, abusive, indecent, profane, boisterous,
> unreasonably loud or otherwise disorderly conduct
> under circumstances in which the conduct tends to
> cause or provoke a disturbance is guilty of a Class B
> misdemeanor.
>
> (2) Unless other facts and circumstances that
> indicate a criminal or malicious intent on the part of
> the person apply, a person is not in violation of, and
> may not be charged with a violation of, this section
> for loading, carrying, or going armed with a firearm,

without regard to whether the firearm is loaded or
is concealed or openly carried.

Wis. Stat. § 947.01.

There is little question that if we analyzed this case solely under subsection 947.01(1), Officer Lomas would have had probable cause to arrest Mr. Gibbs. There are two elements to a typical disorderly conduct offense in Wisconsin: (1) "that the defendant engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct" and (2) "that the defendant's conduct occurred under circumstances where such conduct tends to cause or provoke a disturbance." *State v. Schwebke*, 644 N.W.2d 666, 674 (Wis. 2002) (internal quotation marks omitted). The Wisconsin courts have interpreted the phrase "similar disorderly conduct" broadly to mean "conduct of a type not previously enumerated but similar thereto in having a tendency to disrupt good order and to provoke a disturbance." *Id.* (internal quotation marks omitted). Certainly, driving quickly down city streets, holding an unholstered gun—of any kind or with any level of destructive capacity—in view of other drivers, is conduct with a tendency to disrupt public peace and cause the public to fear for its safety. *See id.* at 676.

Mr. Gibbs nevertheless argues that Officer Lomas did not have probable cause to arrest Mr. Gibbs because subsection 947.01(2) provides that absent "facts and circumstances that indicate a criminal or malicious intent," an individual cannot be cited for disorderly conduct "for loading, carrying, or going armed with a firearm, without regard to whether the firearm is loaded or is concealed or openly carried." In Mr. Gibbs's

view, Officer Lomas should have realized that this limitation on the more general language of the statute exempted his actions from the ambit of the statute.

Subsection 947.01(2) was enacted in 2011 as part of a larger act that expanded concealed carry rights in Wisconsin.[18] The Wisconsin courts have not yet answered important questions about this subsection, such as whether the type of conduct at issue here is "carrying" or "going armed" or is more properly categorized as unprotected conduct punishable under the disorderly conduct statute.[19]

The district court held that, in light of subsection 947.01(2), Officer Lomas could not have had probable cause to arrest Mr. Gibbs because she had no evidence that Mr. Gibbs was

---

[18]  *See* Act of July 8, 2011, § 86, 2011 Wis. Sess. Laws 668, 685 (codified at Wis. Stat. § 947.01(2)) (2011 Wis. Act 35, § 86); *see also United States v. Williams*, 731 F.3d 678, 692 (7th Cir. 2013) (Hamilton, J., concurring in part and concurring in the judgment); *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 654–55 (7th Cir. 2012).

[19]  The parties dispute the significance of the fact that the weapons here were not "firearms" but airsoft weapons. In determining whether she had probable cause to arrest Mr. Gibbs, we are concerned only with the reasonableness of Officer Lomas's arrest of Mr. Gibbs and, in particular, with the extent of her knowledge. When she arrested Mr. Gibbs, she knew that an individual had been using what looked like a firearm in an unusual or alarming way. Public safety demands that officers respond expediently to such threats as if the weapon were real. Mrs. Gruchow's discussion with Officer Lomas certainly provided Officer Lomas with enough information to believe, reasonably, that the weapon was real.

acting with a criminal or malicious intent. The court contrasted Mr. Gibbs's behavior with other conduct that, in its view, might amount to disorderly conduct under subsection 947.01(2), such as "if Gibbs had placed his hand on the trigger, or had pointed the gun at someone or something besides the roof of his own car, or had done anything at all that could reasonabl[y] be construed by an observer as any sort of attempt to hurt himself or to threaten others."[20] Ultimately, the district court held that "the facts known to Officer Lomas at the time she took Gibbs into custody would not lead a reasonable person to believe that Gibbs had violated the newly-amended disorderly conduct statute."[21] It went on to hold that "it would have been apparent to a reasonable officer that Officer Lomas had no reasonable basis for arresting Gibbs" and was therefore not entitled to qualified immunity.[22] Whether the Supreme Court of Wisconsin would take the same view of the scope of the statute is open to serious question.

We think it would be imprudent to base our decision on speculation about the appropriate scope of the Wisconsin statute. In our view, the second section of the disorderly conduct statute poses significant interpretative problems that are best answered by the Supreme Court of Wisconsin.

---

[20]  R.23 at 10.

[21]  *Id.*

[22]  *Id.* at 15–16.

Including the conduct at issue here within the scope of subsection 947.01(2) would no doubt have significant ramifications on issues of state and municipal governance in matters of public safety. In this age of "road rage" and similar motorist misbehavior, an individual's driving around at a high speed while holding an unholstered weapon in plain view of other motorists raises serious issues of public safety. Whether such activity constitutes merely "carrying[] or going armed" should be decided, if at all possible, by a state court far more familiar with the exigencies of state and local governance and far more familiar with the legislative practice of its state. If it were necessary to construe the problematic statutory language in order to resolve this case, we well might consider using the certification privilege accorded to us by the Wisconsin legislature.[23] However, such a necessity is not upon us since the second prong of the established qualified immunity analysis affords a solid basis for decision. "[I]t is apparent that the

---

[23] Wis. Stat. § 821.01 ("The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States or the highest appellate court of any other state when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state."); *cf.* Cir. R. 52(a) ("When the rules of the highest court of a state provide for certification to that court by a federal court of questions arising under the laws of that state which will control the outcome of a case pending in the federal court, this court, sua sponte or on motion of a party, may certify such a question to the state court in accordance with the rules of that court, and may stay the case in this court to await the state court's decision of the question certified.").

alleged right at issue [was] not clearly established" at the time
Officer Lomas acted. *Catlin v. City of Wheaton*, 574 F.3d 361, 365
(7th Cir. 2009). We have stated:

> The relevant inquiry in determining whether a right
> is clearly established is whether it would have been
> clear to a reasonable officer that his conduct was
> unlawful in the situation the officer confronted.
> Where the law is open to interpretation, qualified
> immunity protects police officers who reasonably
> interpret an unclear statute.

*Reher*, 656 F.3d at 775 (citation omitted). As we noted in *Abbott*,
705 F.3d at 714, "[t]he probable-cause standard inherently
allows room for reasonable mistakes." *See Brinegar v. United
States*, 338 U.S. 160, 176 (1949). Here, we deal with the question
in the context of a false arrest suit where the defendant officer
has the added layer of protection of qualified immunity. In this
situation, we ask whether a reasonable police officer in the
defendant's shoes could have believed that probable cause
existed.

We are convinced that Mr. Gibbs did not meet his burden
of refuting Officer Lomas's qualified immunity defense either
by "identifying a closely analogous case or by persuading the
court that the [officer's] conduct [wa]s so egregious and
unreasonable that, notwithstanding the lack of an analogous
decision, no reasonable officer could have thought [s]he was
acting lawfully." *See Abbott*, 705 F.3d at 723–24. Instead of
identifying an analogous case, Mr. Gibbs—like the district
court—points to an informal Advisory Memorandum by the
Wisconsin Attorney General entitled, "The Interplay Between

Article I, § 25 Of The Wisconsin Constitution, The Open Carry
Of Firearms And Wisconsin's Disorderly Conduct Statute, Wis.
Stat. § 947.01." Memorandum from J.B. Van Hollen, Attorney
Gen., to Wis. Dist. Attorneys, Deputy Dist. Attorneys &
Assistant Dist. Attorneys (Apr. 20, 2009), *available at*
http://www.doj.state.wi.us/sites/default/files/2009-news/final-
open-carry-memo-2009.pdf. The Advisory Memorandum
states that "the mere open carrying of a firearm by a person,
absent additional facts and circumstances, should not result in
a disorderly conduct charge." *Id.* at 1, ¶ 1. The Advisory
Memorandum is not, of course, the sort of definitive statement
of the law by the courts that would make a constitutional
violation "clearly established."[24] More importantly, the
memorandum fails to support Mr. Gibbs's position because it
specifically acknowledges, "Even when an act facially resem-
bles the exercise of a protected right, the facts and circum-
stances of a case may give rise to a disorderly conduct charge."
*Id.* at 3, ¶ 5. Notably, the memorandum provided an example:
"[A] person openly carrying a holstered handgun on his own
property while doing lawn work should not face a disorderly
conduct charge. If, however, a person brandishes a handgun in
public, the conduct may lose its constitutional protection." *Id.*
at 4, ¶ 7. Far from clearly establishing that Mr. Gibbs's conduct
was not illegal, the memorandum leaves open the distinct
possibility that Mr. Gibbs's conduct here might be character-

---

[24] The Advisory Memorandum was published in 2009, well before
subsection 947.01(2) was enacted. Therefore, its relevancy to the new
disorderly conduct statute is questionable.

ized as the equivalent of "brandish[ing] a handgun in public" and therefore constitute disorderly conduct. *Id.*

As we have noted earlier, the mere addition of subsection (-2) to section 947.01 hardly makes the law "clearly established." The Wisconsin courts have yet to interpret key terms of the subsection, such as "going armed with" and "criminal or malicious intent."

Nor is this the sort of case where Officer Lomas's conduct was so egregious as to be recognized universally by law enforcement officers as unlawful. Rather, as we have suggested earlier, a reasonable police officer—indeed, a reasonable court—could believe that, under the facts described above, far more than the statutorily exempted activity of "loading, carrying, or going armed with a firearm" was taking place. Despite Mr. Gibbs's repeated contentions that he was "just driving," he obviously was doing more than that.

Indeed, his conduct also was sufficient for a reasonable officer to conclude—in the absence of any guidance from the Wisconsin courts—that a criminal or malicious intent was present, thus removing any protection that subsection 947.01(2) would otherwise have given Mr. Gibbs. For example, Wisconsin state law prohibits firing a gun from a vehicle, *see* Wis. Stat. §§ 167.31(2)(c), 941.20(3), and an officer who receives a tip that an individual was visibly handling an unholstered weapon while speeding may believe reasonably that the individual had the intent to violate that prohibition. Wisconsin also prohibits entering a bar with a handgun under most circumstances, *see* Wis. Stat. § 941.237(2), and the facts known to Officer Lomas when she arrested Mr. Gibbs may have suggested that he had

the intent to violate this statute. Apart from these statutorily based examples of how the facts of this case may have indicated a specific criminal intent, it is also reasonable to interpret these facts as indicating a more general malicious intent. Based on the facts known to Officer Lomas about Mr. Gibbs's behavior, it would have taken no more than an adjustment of his hand position before the gun was pointed out the window of his vehicle or even at himself. A reasonable officer in Officer Lomas's shoes could have interpreted Mr. Gibbs's conduct as motivated by an intent to harm himself or others.

In sum, even if Officer Lomas was mistaken in believing that she had probable cause to arrest Mr. Gibbs, such a mistake was reasonable in light of the facts and circumstances of this case and in light of the undeveloped case law regarding subsection 947.01(2). Consequently, contrary to the conclusion of the district court, Officer Lomas was entitled to qualified immunity for her arrest of Mr. Gibbs.

### 3.

Mr. Gibbs also contends that the search of his car by Officer Lomas violated his Fourth Amendment rights. The Fourth Amendment prohibits, with limited exceptions, warrantless searches. *See Arizona v. Gant,* 556 U.S. 332, 338 (2009). However, "[a]mong the exceptions to the warrant requirement is a search incident to a lawful arrest." *Id.*; *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 627 (7th Cir. 2008). Under the search-incident-to-arrest exception, law enforcement may search a vehicle "incident to a recent occupant's arrest … (1) if the arrestee is within reaching distance of the vehicle during the search, or

(2) if the police have reason to believe that the vehicle contains evidence relevant to the crime of arrest." *Davis v. United States*, 131 S. Ct. 2419, 2425 (2011) (internal quotation marks omitted).

Here, the search was conducted because Officer Lomas had reason to believe that the vehicle contained evidence relevant to the crime of arrest—namely, the weapon that Mr. Gibbs had been holding while driving through Madison. Mr. Gibbs's entire argument regarding the search is that because the arrest violated his clearly established constitutional rights, the search also violated those rights. He makes no other arguments. Since we have held that a reasonable officer in Officer Lomas's shoes could have determined that she had the authority to arrest Mr. Gibbs, it follows that such a reasonable officer also could conclude that she had the authority to search the vehicle incident to that arrest.[25]

Consequently, we hold that the search of Mr. Gibbs's vehicle for the weapon involved in the offense of arrest did not violate Mr. Gibbs's clearly established rights, and Officer

---

[25] An alternative basis for finding Officer Lomas's actions to be within the bounds of the Constitution is the "automobile exception" to the Fourth Amendment's warrant requirement. Officer Lomas could search Mr. Gibbs's Jeep because she had probable cause to believe that she would find evidence of illegal activity (the handgun) in the car. *See, e.g., Arizona v. Gant*, 556 U.S. 332, 347 (2009); *United States v. Ross*, 456 U.S. 798, 806–07, 825 (1982); *Carroll v. United States*, 267 U.S. 132, 149, 153–56 (1925); *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004) (recognizing that the "automobile exception" to the Fourth Amendment's warrant requirement allows "a warrantless search of a vehicle to be conducted so long as there is probable cause to believe it contains contraband or evidence of illegal activity").

Lomas is entitled to immunity from suit for her search of the vehicle.

**Conclusion**

We find it unnecessary to decide whether Officer Lomas violated Mr. Gibbs's constitutional rights to be free from arrest for disorderly conduct and to be protected against a search incident to that arrest because any constitutional rights implicated were not clearly established at the time of Officer Lomas's actions. Therefore, Officer Lomas was entitled to qualified immunity, and the district court erred in denying her motion for summary judgment. Accordingly, we reverse the decision of the district court and remand for further proceedings consistent with this opinion. Officer Lomas may recover her costs in this court.

REVERSED and REMANDED